BALDWIN, *Appellant*, v. WHITCOMB *et al.*

1. **Administration**: PETITION FOR SPECIFIC PERFORMANCE. Section 39, page 148, Revised Statutes 1855, required every petition to the court of probate to enforce against an administrator specific performance of a contract of his intestate to convey real estate, to be verified by the affidavit of the petitioner. Without such affidavit the court acquired no jurisdiction to make the order prayed for.

2. **Presumption of Fraud, how Raised.** Failure of a party against whom fraud is charged to produce as witnesses persons who are alleged·to have participated in the fraud, and who are within reach, will raise a presumption in favor of the charge.

3. **Fraud**: UNUSUAL MODE OF TRANSACTING BUSINESS, A BADGE OF, WHEN. Whenever fraud is the matter in issue, any unusual clause in an instrument, or any unusual method of transacting the business, ·apparently done for effect and to give to the transaction an air of honesty, is of itself a badge of fraud.

4. **Upon** examination of all the evidence, this court holds that an order for specific performance entered by a county court was fraudulently obtained, and, therefore, sets aside a deed executed by the administrator in pursuance of such order.

*Appeal from Mississippi Circuit Court.*—HON. D. L. HAWKINS, Judge.

REVERSED.

This was an action brought by Mary J. Gray, as guardian of Wm. Baldwin, against James H. Bethune, executor of George Whitcomb, deceased, James H. Bridges, and the heirs of said Whitcomb. The petition prayed that a deed to certain real estate therein described, should be set aside as having been fraudulently obtained by the said Whitcomb from one Drakeford Gray, administrator

of Samuel Baldwin, the father of the said William. The circuit court found for the defendants and dismissed the plaintiff's petition. The facts are fully stated in the opinion.

*J. B. Dennis* for appellant.

*Louis Houck* for respondents.

SHERWOOD, C. J.—In the year 1856, Samuel Baldwin owned and resided on a farm in Mississippi county. On the 8th day of May, in that year, he contracted with the defendant, James H. Bridges, to sell the same for $1,800. The title bond which evidenced the contract, provided that the payments should be made as follows:   $900 on the 1st day of January, 1857, and a like sum on the 1st day of January, 1858.   It was also recited in the bond that Bridges had executed his two promissory notes corresponding with the provisions above mentioned, as to the times and amounts of payments of the purchase money.   Soon after this occurrence the parties rescinded the contract, and the title bond was, for the sum of $50, surrendered by Bridges to Baldwin, who thereupon delivered the bond to his wife for safe keeping.   Baldwin continued to reside on the premises, treating and claiming them as his own, until his death, which occurred in the year 1857.   Bridges resided on an adjoining farm, and never, after the contract was rescinded, made any claim to the land. ' Upon Baldwin's death the bond was found among his papers.   There is such an array of testimony on the above mentioned points, as to banish all doubt as to the entire correctness of the foregoing brief statement.

On the hearing of this cause, and the introduction of the plaintiff's evidence, the defendants, in support of their answer, introduced in evidence a petition for specific performance, filed by George Whitcomb, the then clerk of the county court, also the bond before mentioned, upon which was an indorsement which bears date May 26th, 1856, and

has the name of Baldwin signed to it, and purports to transfer to George Whitcomb all Baldwin's right in the second note mentioned in the bond, *i. e.*, the one due January 1st, 1858. There also appears on the bond an indorsement, without date, purporting to be signed by the defendant, James H. Bridges, and to transfer for value received, the bond to George Whitcomb. The defendants also introduced in evidence the promissory notes mentioned in the title bond, one of which had an assignment thereon to George Whitcomb, purporting to have been signed by Samuel Baldwin; and, as appears from Whitcomb's petition, was assigned prior to the transfer of the bond.

The defendants also introduced in evidence the decree for specific performance, entered by the county court of Mississippi county, April 20th, 1858, on the same day the petition was filed. This decree recites that Drakeford Gray, the administrator of Baldwin, appeared in open court, entered his appearance, and waived any other or further notice, and after making the usual recitals, the decree requires the administrator, Gray, in specific execution of the contract of his intestate, to execute and deliver a deed to Whitcomb. The petition for specific performance alleges that Bridges paid Baldwin, in his life-time, the amount of the first note, and that Whitcomb, on the 26th day of May, 1856, paid to Baldwin the amount of the second note, and that thereupon he assigned to Whitcomb the second note, and made the indorsement to that effect on the bond.

Gray is positive that he never appeared in the county court and waived service of notice as recited in the decree for specific performance, and equally so that neither Bridges nor Whitcomb ever approached him to induce him to waive service of notice. This witness also testifies that Whitcomb was his adviser, and exercised great influence over him about the business of the estate; that at a sheriff's sale of the interest of one Willett in the land in question, Whitcomb bid it off, and in a little while came to

Gray and induced him to sign and acknowledge the deed, which he did without reading it, supposing it to be all right, and that witness never did knowingly and understandingly sign a deed for the land in controversy under an order of the county court for specific performance. Gray was very dissipated while administrator, and Bridges had him completely under his control.

According to Whitcomb's own petition, Bridges having paid the first note during Baldwin's life-time, and the second note having been paid by Whitcomb at the time of the alleged indorsement on the 26th day of May, 1856, and having subsequently received from Bridges a transfer of the title bond, he was entitled at least as early as the decree and reception of the deed made by Gray, to the land in question; but we find that he made no claim to the land during the first part of Gray's administration. Although he knew that Gray was paying rent to the estate for the land while acting as administrator, yet Whitcomb asserted no title to the land as the assignee of the title bond from Bridges, and only set up such a claim during the latter part of Gray's administration, and only then by reason of the purchase under execution of Willet's interest in the land.

As to Bridges, we find him, when applied to for advice by Mrs. Gray, telling her that Baldwin had no title to the land, that it was sold to pay George Beeler for the purchase money, and to do nothing with it.

W. G. Cooley, former judge of the county court, who had testified to the contract between Baldwin and Bridges, having been rescinded, and to having with other witnesses found the title bond among the papers of Baldwin's estate, said: "I have no recollection of such a judgment having been made by the county court, although the records were signed by me. Had my attention been called to any such proceeding, it would at once have reminded me of the rescission made between Baldwin and Bridges. I am positive no such decree was ever made by the county court. The record, as it now is, could have been made by the clerk

and the reading of that part of it omitted. I don't see any other way it could have been done. I had unbounded confidence in Mr. Whitcomb, and never re-read the record."

The decree for specific performance, referred to by Judge Cooley in his deposition, was pleaded by defendants as *res judicata*, and in bar of the present proceeding, and plaintiff's reply alleged that the decree was obtained by fraud, and this was the charge also in the petition, and this is the chief point for determination.

It must be confessed that it would be to the last degree hazardous to set aside, except for the most weighty considerations, a judgment apparently entered with customary regularity upon the records of a court. But so much cannot be said of the judgment under discussion. The statute (1 R. S. 1855, p. 148, § 39) requires the petition for specific performance to be verified by the affidavit of the petitioner. This was not done. The petition is signed by Whitcomb; underneath that is drawn the blank form of an affidavit, to be sworn to by Whitcomb, but his name is not subscribed; and underneath the blank form of affidavit are written these words: "Sworn to in open court, this 20th day of April, 1858." This cannot be regarded as an affidavit, or as a compliance with the statute. The statute which confers jurisdiction over cases for specific performance on probate courts is limited to contracts in writing, and, therefore, that statute is, in accordance with a familiar rule, to be strictly construed. That the petition be verified by affidavits is, therefore, one of the essentials of jurisdiction. *Fletcher v. Keyte*, 66 Mo. 285.

1. ADMINISTRATION: petition for specific performance.

But passing this point, as the transcript before us may possibly be imperfect—let us look to the very merits of this cause.

There is no pretense that there was but one transaction between Baldwin and Bridges, or that the latter ever received from the former but one title bond, and that for land on which Baldwin lived and died. Taking this, then,

as established, that there was but one title bond, the same one that was recorded by Whitcomb, on the 10th day of May, 1856, and read by both Judge Cooley and John M. Utterback, when they, together with James Husk, the first administrator of Baldwin's estate, and Felix L. Mills, went to examine the papers of the estate, shortly after Baldwin's death, let us see what bearing and weight is to be given to the decree for specific performance, as well as the indorsement appearing on the original title bond and one of the promissory notes, when contrasted with and confronted by the great amount of positive testimony that the contract was rescinded, the title bond surrendered, and that Baldwin continued, after the rescission, to live on the farm, claiming it as his own, and died in possession of it as owner; when contrasted also with, and confronted by, the other testimony and evidence of the bond having been delivered to the wife for safe keeping, and found, as before stated, among Baldwin's papers and read by two of the witnesses, at such examination. In thus contrasting the evidence offered by the opposing parties, the danger before mentioned must not be lost sight of, that of overthrowing and invalidating the judgment of a court of competent jurisdiction, apparently entered in due observance of legal requirements. But in considering this danger let us not lose sight of one equally great, if not greater, that of permitting flagrant fraud to be successful when it arrays itself in the garments of justice and apes the solemn forms of the law.

Perhaps it will be found, upon a careful examination, that the learned judge who heard this cause, and decided adversely to plaintiff's claim, had his attention directed too much to the former, and not sufficiently to the latter danger.

The annual settlement of Gray, filed December 10th, 1858, offered in evidence by defendants, shows that " one note, due January 1st, 1858, on J. H. Bridges, for $900," had been inventoried as belonging to Baldwin's estate.

This note was the second one mentioned in the title bond, and the very one that the indorsement on that bond, made May 26th, 1856, states Baldwin had "sold and assigned to George Whitcomb," and the petition of the latter for specific performance alleges that "said Baldwin then and there assigned the note on Bridges, for the last payment, to petitioner, and also indorsed the same upon said contract in writing." Now, if, as the indorsement recites, Baldwin, on the 26th day of May, 1856, assigned to Whitcomb the second note, then Baldwin or Whitcomb must have been in possession of the bond, and Baldwin must, after assigning the second note, have delivered it to Whitcomb; and Baldwin also must then and there have made the indorsement on the title bond, and left that too in Whitcomb's possession. Now, if there was but one title bond executed and delivered by Baldwin to Bridges, and Bridges afterward surrendered this bond to Baldwin, and the bond was afterward found in Baldwin's papers, and this we are compelled to believe, or else human testimony is no longer reliable, then it must follow that the indorsement on the title bond, if honestly made, was made prior to the surrender of the bond by Bridges to Baldwin. Can this be regarded as at all probable? Would Bridges, with such an indorsement staring him in the face, informing him that the second note had been assigned to Whitcomb, cancel the contract with Baldwin and surrender the title bond? Credulity itself could not, to this last question, frame an affirmative answer.

Again, Baldwin, if an honest man, and there is nothing to impeach his honesty, would not have accepted the surrender of the title bond from Bridges without informing him that the title to the second note was in Whitcomb; that the note had been assigned to him and was in his possession. Moreover, if the second note was assigned and delivered to Whitcomb, how comes it that the same note is found among Baldwin's papers? As it certainly was. The carelessness of Bridges might account for the

42—71

second note remaining in Baldwin's possession, if it had not been assigned to Whitcomb; but the latter, after taking a formal assignment of the note, and after Baldwin had made a formal recital of such assignment on the bond, would never have surrendered the note to Baldwin. Nor would the latter have accepted the title bond when the very indorsement thereon informed him that it had been assigned for value received to George Whitcomb.

These considerations constrain us to the opinion that the indorsements were not made prior to the surrender of the title bond, and, therefore, were not honestly made. And it is especially noteworthy in this connection, that although Baldwin's signature must have been well known in the community where he lived, no attempt was made, on the part of defendants, by testimony, to show at the hearing that Baldwin's genuine signature was subscribed to the indorsement before spoken of. Nor was any attempt made to show by testimony that Baldwin's signature appeared as assignor of the second note.

But the most remarkable incident connected with the whole hearing of the cause was this: The petition charged, 2. PRESUMPTION OF FRAUD, HOW RAISED. in pointed terms, that the judgment of the county court, ordering specific performance, was procured by the combined fraud of Whitcomb and Bridges; that the former, as clerk of the county court, found the title bond among the papers of Baldwin's estate, with no marks of cancellation upon it, and combining and confederating with Bridges, induced him to transfer the title bond to him. Bridges was a party defendant to this proceeding, he knew all about the matter, and yet he came not forward as a witness, nor did his co-defendants bring him forward in that capacity. The presumption which such a failure to introduce testimony produces, is always unfavorable toward the party thus failing, as numerous authorities show. *Henderson v. Henderson*, 55 Mo. 534; *Cass County v. Green*, 66 Mo. 498; Bump on Fraud. Convey., 53, and cases cited.

There is another point in this cause not to be overlooked in considering the charges of fraud which plaintiff makes. The law in respect to judgments for specific performance, when ordered by county courts, requires, as before stated, that the petition be verified by affidavit of the petitioner. No other affidavit is required. Yet we find underneath the statement that the petition was "sworn to in open court," the affidavit of James H. Bridges, made before Whitcomb, in which Bridges swears to the truth of the petition, and also that " to his knowledge, no part of the within contract has been satisfied, except as stated in the petition." What was the object of such additional and unwarranted affidavit? Its only purpose could have been to give an appearance of fairness—a color of verity and validity to the transaction—for the petition is signed by Whitcomb and not by an attorney; and having long been clerk of the county court, it may well be presumed that he was thoroughly conversant with the statutory provisions, and knew that the affidavit of Bridges added neither verification nor force to the petition. The unnecessary affidavit of Bridges would, therefore, seem to bring this case within the principle of the maxim: " *Clausulae inconsuetae semper inducunt suspicionem.*" For, whenever fraud is the matter in issue, any unusual clause in an instrument, any unusual method of transacting the business, apparently done with the view for effect and to give to the transaction an air of honesty, is of itself a badge of fraud. For, " when the part is overacted the delusion is broken and the fiction appears." *Comstock v. Rayford*, 12 Sm. & Marsh. 369. This has been the rule ever since *Twyne's case*, 3 Coke 81, where it was held a circumstance of grave suspicion that a clause in the conveyance recited that the gift was made honestly, truly and *bona fide*. Bump Fraud. Convey., 50 *et seq.*, and cases cited.

Many of the circumstances above detailed, would not, perhaps, when singly considered, be sufficient to carry con-

viction to the mind that fraud had been perpetrated, but they each have a decided tendency in that direction.

In conclusion, after a careful examination of the evidence adduced, the substance of which we have stated, we have been able to reach no other result than that the charges of the petition have been amply supported by the evidence. Viewing the matter in this light, we reverse the judgment and remand the cause, with directions that the circuit court enter a proper judgment in behalf of the beneficial plaintiff, who is now of age, after having first taken the usual account as to rents and profits. All concur.