Hoge v. Hubb.

HOGE v. HUBB *et al.*, *Appellants.*

| 94 | 489 |
|----|-----|
| 97 | 275 |
| 94 | 489 |
| 104 | 189 |
| 105 | 181 |
| 94 | 489 |
| 143 | 510 |
| 94 | 489 |
| 146 | 520 |
| 151 | 84 |

1. **Deed**: PROOF OF EXECUTION: PRIMA-FACIE EVIDENCE: STATUTE. Where a deed has been recorded ten years and the land claimed or enjoyed under it during all that time, the deed itself is *prima-facie* evidence of its execution, without further proof, and it is admissible in evidence, although not properly acknowledged. (R. S., sec. 2310.)

2. **Public Lands**: ASSIGNMENT OF WARRANT: EVIDENCE: NOTICE. Although records of copies of copies of certificates of location of land warrants and assignments indorsed thereon are not admissible in evidence, their admission constitutes harmless error where the assignments are otherwise proved without objection, and those objecting to the admission of such records were purchasers with full and actual knowledge of the claim through and under the assignee of the certificate.

3. **Registry**: NOTICE. Actual notice countervails the effect of registry and dispenses with it.

4. **Public Lands**: LOCATION AND ASSIGNMENT OF WARRANT: FAILURE OF CONSIDERATION: LACHES. One who located a land warrant and assigned his certificate of location, by indorsement, the consideration to be paid in corn, cannot, under the facts of this case, after the lapse of fifteen years, be heard to complain that he never received the stipulated consideration, and his claim to that effect will be deemed stale and barred, both at law and in equity.

5. **Delinquent Taxes**: PAYMENT: RECEIPT: SALE. Where the agent of a land owner went to the office of the collector and paid all taxes which the back-tax book showed to be due and took the collector's receipt therefor, it was equivalent to full payment, and the owner was not bound to take notice of subsequent steps for a sale for additional taxes found to be due, and such sale was without jurisdiction. (Per Sherwood, J.)

6. ———: SALE: FRAUD. The finding of the lower court that a certain judgment for delinquent taxes against the plaintiff was procured by the collusion and fraud of the defendants, and should not be allowed to stand, when attacked in a court of equity, as in this case, sustained.

*Appeal from Jasper Circuit Court.*—HON. M. G. MCGREGOR, Judge.

AFFIRMED.

*Harding & Buller* for appellants.

(1) The court erred in overruling the defendants' objections to the record of alleged copies of the duplicates. The statute nowhere provides for recording copies of such instruments. R. S., secs. 691, 702–3–4–5. And even if the originals had been recorded the record would have been inadmissible because they purported to have been acknowledged before a justice of the peace in Illinois, and there was no evidence that such a justice could take acknowledgments. *Crispen v. Hannovan*, 50 Mo. 415; *Musick v. Barney*, 49 Mo. 458. There was no proof of the loss or destruction of the originals, which would have been necessary before even the original copies could be received in evidence. *Burton v. Murrain*, 27 Mo. 235. (2) Payment of the purchase price is the very essence of the equity for a decree in this class of cases, and it being neither alleged, proved, nor found by the court that Bagnley ever was paid for the land, and the evidence showing that in fact he never was paid, there is no equity in the plaintiff's bill and it ought to have

been dismissed. *O'Fallon v. Kennedy*, 45 Mo. 129. Plaintiff seeks relief in a court of equity by a decree in the nature of specific performance. Such applications are always to the discretion of the court and will not be entertained except in cases where it would be strictly equitable to make such decree. *Southworth v. Hopkins*, 11 Mo. 331. And the plaintiff must make out a case by clear and positive evidence, so as not to leave a reasonable doubt in the mind of the chancellor. *Bunse v. Agee*, 47 Mo. 270; *Kennedy v. Kennedy*, 73 Mo. 78; *Hunter v. Hopkins*, 12 Mich. 227. (3) The evidence tends very strongly to show that the alleged assignment of the certificates of location was obtained by fraud and false pretenses on the part of Dixon such as would have amply justified a court of equity in setting it aside. *Phillips v. Moore*, 11 Mo. 600. (4) The only pretense of payment is the claim that Bagnley accepted McCurdy's worthless weigh tickets as payment. This he flatly denies, but even if he did take them it was at the best merely under protest, and in consequence of false representations, operating as a fraud, and there is not a *scintilla* of evidence that he expressly agreed to take the paper as absolute payment. In such case it is no payment. *Kenneger v. Newby*, 14 Kas. 164; Pars. Notes and Bills, 85 and 150, *et seq.* (5) Neither does the court find that it was paid. This is a fatal defect. *Jacobs v. Smith*, 89 Mo. 673. (6) We think the ten-year statute of limitations is a complete defence in this case. *Hunter v. Hunter*, 50 Mo. 445. (7) But aside from that the delay of nineteen years is such laches as to preclude a recovery. *Stevenson v. Saline County Court*, 65 Mo. 429; *Landrum v. Bank*, 63 Mo. 48. (8) The tax sale was valid and the court had no right to set it aside. The judgment was conclusive as to the amount and validity of the taxes. *Wellshear v. Kelley*, 69 Mo. 343; *Raley v. Guinn*, 76 Mo. 272.

*Shields & Sennett* for respondent.

(1) The patents are our muniments of title and were sufficient to apprise all the world of our title. U. S. Stat. at Large, sec. 2414; *Stoddard v. Chambers,* 2 Howard, 284; *Vatter v. Hinde,* 7 Peters, 254; *May v. LeClane,* 11 Wallace, 232; *Mason v. Black,* 87 Mo. 329. Notice to the agent is notice to the principal. *Meier v. Blume,* 80 Mo. 179. (2) The consideration for the assignment of the certificates cannot be attacked. *Henderson v. Henderson,* 55 Mo. 534; *Ames v. Gilmore,* 59 Mo. 537. The weigh checks being sold and delivered to Bagnley and the certificates to Dixon, each was protected in his possession of the property thus transferred. *Bank v. Bank,* 71 Mo. 183. The appellants could not strengthen their title by purchasing at the tax sale. Blackburn on Tax Titles, 400. (4) The tax title should be set aside because fraudulently acquired, and because the price was grossly inadequate. Perry on Trusts, sec. 220; 1 Story's Eq. Jur., sec. 246; *Jewett v. Palmer,* 7 Johns. Ch. 65; 30 Mo. 148; *Railroad v. Brown,* 43 Mo. 297; *Curd v. Lackland,* 49 Mo. 454; 50 Mo. 438; *Durfee v. Moran,* 57 Mo. 374. And all titles afterwards acquired should be held in trust for the original assignee. 2 Story Eq. Jur., secs. 90, 784; 1 Perry on Trusts, secs. 122–231; Sugden on Vendors, 175; *Halsa v. Halsa,* 8 Mo. 220; *Damschroeder v. Thias,* 51 Mo. 100; *Key v. Jennings,* 66 Mo. 356; *Widdicombe v. Childers,* 84 Mo. 382. And this applies to purchasers at judicial sales. *Roberts v. Mosley,* 64 Mo. 507; *Baker v. Railroad,* 86 Mo. 75. (5) The statute of limitations debars any claim for the purchase price or consideration paid to Bagnley for the land and it cannot be set up to defeat the title in plaintiff. The contract between Dixon and Bagnley was complete and executed when the warehouse receipts or weigh checks

were delivered by Dixon to Bagnley and the duplicates assigned and delivered by Bagnley to Dixon. As Dixon said in his deposition, that was the end of it. *Bobb v. Bobb*, 7 Mo. App. 501 ; 5 Wait's Act. and Def., p. 578, sec. 33.

SHERWOOD, J.—Petition in equity to divest the defendants of legal title to certain land in Jasper county, to-wit : The northwest quarter of the northwest quarter and the southwest quarter of the southwest quarter of section 14, and the northwest quarter of the northwest quarter of section 23, township 28, range 33. To maintain the issues on his part, and to show such equitable title to the land as would afford basis for the relief sought, the plaintiff introduced in evidence the following : (1) A patent to Richard Bagnley, dated August 12, 1858, for the northwest quarter of the northwest quarter of section 24, township 28, range 33. (2) A patent to Richard Bagnley, dated June 3, 1858, for the northwest quarter of the northwest quarter of section 23, and the southwest quarter of the southwest quarter of section 14, township 28, range 33. (3) Pages 143 and 144, of book 35, of the deed records of Jasper county, as follows :

"Military Bounty Land Act of Sept. 25, 1850.

"Register's Office, Springfield, Mo., Aug. 21, 1857.

"Military Bounty land warrant No. 100,058, in the name of Abraham Prosser has this day been located by Richard Bagnley, upon the northwest quarter of the northwest quarter of section 14, township 28, range 33, subject to any preëmption claim, which may be filed for more land within forty days from this date. Contents of tract located, forty acres.

"W. H. GRAVES, Register."

"For value received, I, Richard Bagnley, to whom the within certificate of location was issued, do hereby sell and assign unto James Dixon and to his heirs and

assigns forever, the said certificate of location and the warrant and land therein described, and authorize him to receive the patent therefor.

"Witness my hand and seal this 15th day of November, 1861.

"Attest:　　　　　　　RICHARD BAGNLEY, [Seal]"

"State of Illinois,　　⎱ ss.
"County of Marshall, ⎰

"On this 15th day of November, 1861, before me personally, came Richard Bagnley, to me well known, and acknowledged the foregoing assignment to be his act and deed, and I certify that the said Richard Bagnley is the identical person to whom the within named warrant was issued.

"JOHN P. BOIRE, J. P."

"Department of the Interior, ⎱ November 8, 1875.
"General Land Office.　　　⎰

"I, S. S. Burdette, commissioner of the general land office, do hereby certify that the annexed is a true and literal exemplification of the duplicate certificate issued upon the location of warrant No. 100,058 for forty acres, act of September 25, 1850, and of the assignment endorsed thereon on file in this office.

"In testimony whereof I have hereunto subscribed my name and caused the seal of this office to be affixed, at the city of Washington, on the day and year above written.

"S. S. BURDETTE,

"Commissioner of the General Land Office."

"The foregoing instrument was filed for record in this office on the 19th day of November, 1875, at 4:45 P. M.

"JAMES A. BOLEN, Recorder

"By I. E. STEINMETZ, Deputy."

Also, a precisely similar copy as to the northwest quarter of the northwest quarter of section 23, and the southwest quarter of the southwest quarter of section 14, township 28, and range 33.

To all of which the defendants objected, as not the best evidence and because the said records did not purport to be copies of the originals, but merely of copies, and were not entitled to be recorded, and because the said assignments purported to have been acknowledged before a justice of the peace in the state of Illinois, and were not properly acknowledged ; all of which objections the court overruled, and the defendants excepted at the time.

Plaintiff offered in evidence a quit-claim deed to W. V. Hoge, dated July 29, 1871, recorded September 4, 1871, book V, page 272, conveying the land in controversy, consideration four hundred dollars, acknowledged before a justice of the peace in Ohio ; to the reading of which in evidence the defendants objected because the same was not acknowledged before an officer authorized by law. Plaintiff then read in evidence a warranty deed from James Dixon and wife to W. V. Hoge, dated July 30, 1880, recorded September 20, 1880, conveying the land in controversy, consideration four hundred dollars, reciting that it was made to correct a defect in the above mentioned quit-claim deed ; also a power of attorney from Richard Bagnley to Richard Lloyd, dated November 17, 1874, duly acknowledged and recorded November 17, 1875, empowering the sale and conveyance of said land ; also a quit-claim deed under said power of attorney by Richard Bagnley to W. D. Addison, dated December 15, 1874, recorded December 22, 1874, consideration eighty dollars, conveying the land in controversy ; also a power of attorney from W. D. Addison to Richard Lloyd, dated May 24, 1876, recorded September 12, 1876, duly acknowledged and recorded, empowering him to sell and convey said land ; also a deed from W. D. Addison by Richard Lloyd, his attorney in fact, to Charles Hubb, dated June 9, 1876, recorded June 15, 1876, conveying the land in controversy, consideration four hundred dollars ; also a

quit-claim deed from Charles Hubb to Julius Maas, dated July 27, 1876, recorded January 22, 1877, conveying one-third of said land, consideration $133.33; also the record of a mortgage deed made by W. C. Betts to Julius Maas, dated October 13, 1879, recorded October 15, 1879, conveying an undivided one-third of said land to secure a note for three hundred dollars. To which defendants objected and excepted as irrelevant and incompetent; also the record of a sheriff's deed to Charles Hubb, dated October 19, 1878, duly acknowledged and recorded December 31, 1878, reciting a judgment in the common pleas court of Jasper county, in favor of Thos. A. Wakefield, collector, and against W. V. Hoge, rendered May 16, 1878, for delinquent road taxes for the year 1874, for seventy cents principal and forty-four cents interest, conveying the land in controversy, consideration one dollar; also, the original record filed in said tax suit, including the petition, tax bill, affidavit of non-residence, order of publication and judgment, all in regular order and proper form.

John N. Wilson, county clerk, testified that the way the road tax came to be returned delinquent was that the county was under township organization and the road-tax books were placed in the hands of the township road overseer for collection, and he returned them delinquent when unpaid after the other delinquent lists had been returned, and they were then carried forward into the back-tax book, but this was not done until in the summer of 1875, and that from this book all the taxes on the land in controversy for the year 1874 appeared to be paid except the road tax. G. P. Cunningham testified that this land was about three miles from Webb City, and had probably doubled in value since 1870, and he thought was worth twenty dollars per acre, and that he attended to paying the taxes for plaintiffs and took the tax receipts produced in evidence.

Isaac Fountain testified that the land was worth ten dollars per acre in 1878.

Plaintiff also introduced testimony tending to show that W. C. Betts requested the collector's attorney to institute the tax suit. Among the tax receipts thus produced in evidence was one for the year 1874, which contained these words:

"Ex-officio Collector's office,

"Jasper Co., Mo., Carthage, May 18, 1875.

"Received of W. V. Hoge, the sum of seven dollars and sixty-four cents, being the amount of tax, interest, and costs upon the following described real estate (assessed to ——— ); and returned delinquent for the year 1874, viz:" (Giving description of the land in question and of the different taxes assessed against it), and the aggregate amount of the tax is stated to be $7.64.

This receipt is duly signed by the proper officer.

I. The objection taken to the quit-claim deed of 1871, because of not being properly acknowledged, is not well taken by reason of the provisions of section 2310, Revised Statutes, 1879, declaring that, "any writing, instrument, or deed, purporting to affect any real estate, or any right or interest in or to the same, and such real estate, right, or interest in, or to the same, shall have been claimed or enjoyed by any person, by or through such writing, instrument, or deed, for a period of ten consecutive years, such writing, instrument, or deed, and a certified copy thereof, and of the time of its record shall be *prima-facie* evidence of the execution of such writing, instrument, or deed, and of its genuineness, and time of record ; provided that said record thereof shall have been made at least ten years next before such writing, instrument, or deed, or certified copy thereof, is offered in evidence." For this reason, the deed of 1871 was properly admitted in evidence.

Vol. 94—32

II.   As much cannot be said of the admission of the records of the *copies of copies* of the certificates of location and of the acknowledgment thereof.   But such admission was a harmless error in consequence of two facts : (1) that the assignment and transfer of the certificates was elsewhere proven by the deposition of Bagnley read without objection ; and (2) the further fact, that it was established beyond question, that the defendants were purchasers with full and actual notice of plaintiff's claim.   Such notice countervails the effect of registry and dispenses with it.   R. S. 1879, sec. 693.   This is the general doctrine apart from statutory regulation.

III.   The case at bar has been made to rest by the defendants, for the most part, upon the point whether the consideration for the transfer of the certificates of location, by Bagnley, to-wit, the corn, had been delivered to him by Dixon, the assignee of such certificates. Bagnley's deposition was twice taken, first on March 10, 1882, at the instance of plaintiff.   In that deposition, when speaking of the certificates of location, he testified : "I assigned and delivered them to James Dixon, somewhere about the year 1861."   But not a word does he utter, not an intimation does he give, that the corn was the consideration of the transfer, or that it had not been delivered to him, by Dixon, although in the spring of 1876, some six years before, he had written a letter to Betts, one of the defendants, stating that "he had traded the certificates to one James Dixon, for a lot of corn, and never got the corn, and he had not been paid a cent for the land, and he had, therefore, refused to deed it to Hoge, until he was paid for it."   In the same deposition, he disclosed that he knew Richard Lloyd, and had known him over twenty years ; that Lloyd had lived in the same county with him in Illinois ; that Lloyd knew of the transfer of the certificates, at the time it was made, and although the certificates were no longer in Bagnley's possession, Lloyd came to him,

either before the time he obtained the power of attorney, or else at the time, and said that " *there was some flaw in the certificates and he could straighten it out.*" Addison, whom Bagnley did not know, and to whom the deed was made, paid Bagnley nothing; but Lloyd paid him eighty dollars, fifty dollars in rent Bagnley owed him and thirty dollars in money. This is the substance of Bagnley's first deposition.

His second deposition was taken January 27, 1883, at the instance of the defendants, in which he testifies in effect that Dixon had swindled him by promising to pay him for the land, $1.50 per acre, in corn, two hundred and thirty bushels or thereabouts, but had given him worthless weigh checks on McCurdey, with a guarantee to make them good; that McCurdey was insolvent; that he never received the corn from McCurdey, and that, on the night of the day that Dixon delivered the weigh checks, he departed for the east and never adjusted the matter; that he had written to him about the matter, but that Dixon replied that he had traded the land off and had nothing more to do with it. After that, and during the war, he had a conversation with Dixon about the matter, and proposed to him that he should give him security and take a deed for the land; that one time he asked him two hundred dollars for the land, and another time offered it to him for fifty dollars; that Dixon replied that he had the thing safe any way and it was not necessary to give anything; that, after this conversation with Dixon, he had no further conversations with him of any particular importance, and that, about one year from the time witness transferred the certificates, he wrote a letter to the department at Washington, and ordered the patents not to be issued for the land. This is the purport of Bagnley's second deposition.

No effort, it seems, was made to ascertain whether such a letter, as just mentioned, was ever received

at Washington; and presumptively it was received in due course of mail, if mailed. It is elsewhere disclosed by the record, that, after the transfer of the certificates, Bagnley and Dixon were residents of the same county in West Virginia, and that Hoge, during the war, and at the present time, is a resident of Wheeling, in that state. The purport of Dixon's deposition, taken March 26, 1883, is, that he made no guarantee that the weigh checks were good; but that they were good; that he did not leave the night succeeding the day he delivered the checks; that the checks were delivered and received in payment of the certificates; that, previously to Bagnley taking the checks, he had been to McCurdey and ascertained that Dixon had the necessary amount of corn there in the warehouse; that the corn was there and could have been gotten from McCurdey; that he remained in Henry, Illinois, long enough to make three or four trades after he delivered the checks; that four hundred bushels of corn was the amount to be delivered to Bagnley; that the latter, after the transaction was over, twitted him a little with having land in a state that had seceded, and wanted to know how Dixon was going to get it, and thought that he had the best of Dixon, and that he did; for the corn was there and he could get it any time, and McCurdey was then good. Dixon further testified that Bagnley, after having made the trade, never at any time demanded anything from him in regard to the contract, or made any claim or proposal about it; that he never received the scratch of a pen from Bagnley in reference to the land; that, after he left Illinois, he never saw Bagnley until December, 1875, when he went to Illinois, at the instance of Hoge, to get a quit-claim deed from him; that he then stated that he had lost the price of the land, his corn, through McCurdey; that witness presented the deed to Bagnley; but it being Christmas day, no magistrate could be obtained to take the acknowledgment; that Bagnley

Hoge v. Hubb.

agreed to sign it, have it acknowledged, and forward it to witness, at Princeton, Illinois, the next Monday or Tuesday, but never did so; deceived witness; that Bagnley expressed regret for having made the deed to Lloyd; stated that he had failed in business, was owing Lloyd a small amount, and Lloyd had persuaded him to make him the deed.

This deposition of Dixon's was taken subsequently to the last deposition of Bagnley, and in it are many statements wholly at variance with those of Bagnley; but as the hearing of this cause did not occur till April, 1885, there was ample time in which to have again taken Bagnley's deposition and contradicted the additional statements made by Dixon. This, however, was not done, and Dixon's statements as to Bagnley's expressions of regret as to having made the deed, or power of attorney, to Lloyd, and as to his reasons for so doing, stand uncontradicted. And it is certain that, so far as can be seen, from any outward manifestation, apart from his own testimony, Bagnley did not make any complaint of his contract with Dixon, until in the spring of 1876, when he wrote the letter to Betts, complaining that he had not received the corn, according to contract; but this was some fifteen years after the contract was made, and only a few months after the visit made to him to induce him to perfect Hoge's title by a quit-claim deed. Equity favors the vigilant, not those who slumber on their rights. After such a lapse of time, when, according to Bagnley's story, ample opportunities were afforded him to assert his rights and of compelling their recognition in the courts of the country, his demand must be deemed stale and his claim barred, both at law and in equity, unless some circumstances not disclosed by this record had been disclosed. Bagnley's claim, therefore, for unpaid corn must be held without foundation, and this point being thus ruled the defendants have

no standing in court, unless it be on the basis of their tax deed, and this point is the next for consideration.

IV.   The payment of a tax or its equivalent, the offer or tender of the same to the proper officer, destroys the lien of such tax, and renders invalid any sale made for the enforcement thereof.   This point is established by abundant authority.   The existence of the tax debt is what creates the lien and gives jurisdiction to sell ; so that if payment or tender of the tax be made, thenceforth the lien is discharged and the power to sell at all ends.   In the present instance, as already seen, the agent, Cunningham, went to the office of the collector, and paid all the taxes which the back-tax book showed to be due, and took a receipt therefor.   Afterwards, owing to some matter connected with township organization, a petty road tax of seventy cents was placed against the land as delinquent taxes on the back-tax book, and for this sum, together with its accrued interest, forty-four cents, such proceedings were had, at the instance of one of these defendants, that the land, one hundred and twenty acres in distinct parcels, worth, as the court finds, eighteen hundred dollars, was sold and bid in by another of the defendants at less than *one cent per acre*.   The point, as to the invalidity of a tax sale made in circumstances just like the present one arose in Pennsylvania : The owner of land went to the proper office, to pay his taxes, and a list was made out for him, from which, by mistake, *a road tax* was omitted ; he paid all the list called for, and it was held, in an action of ejectment, that, for all the purposes of a sale, this was equivalent to full payment ; that the statement and receipt in that case, their correctness not being assailed, were clear evidence that the owner asked the officer for the taxes due by him, and paid all that was demanded, and that, after this was done, the owner was not bound to take notice of subsequent steps to a sale, and the sale was without jurisdiction.   *Breisch v.*

*Coxe*, 81 Pa. St. 336; see, also, *Bennett v. Hunter*, 9
Wall. 326; *Tracey v. Irwin*, 18 Wall. 549; *Bennett v.
Hunter*, 18 Gratt. 100; *Doe v. Burford*, 26 Miss. 194;
*Jiska v. Ringold Co.*, 57 Ia. 630; *Kinsworthy v. Austin*, 23 Ark. 375; Cooley on Tax (2 Ed.) 450, 453, and
cas. cit.

V. But aside from this view, and treating the judgment in this case as conclusive upon the plaintiff; looking at it from a strictly legal standpoint, yet with that
jurisdiction is mixed such collusion between these
defendants, in their endeavor to obtain the property of
the plaintiff, as found by the court below, that such
judgment thus sought and obtained ought not to be
permitted to stand before the plenary powers of a court
of equity, when invoked as in the present case; and
there is abundant evidence in this record of such
collusion. The very shifting of this property from one
to the other, beginning with Lloyd, whose professed
purpose was to straighten out a flaw in the certificates,
although none existed, and coming down to the
defendants, is significant of the interest which actuated
them. And when, upon the top of that, you have the
tax proceedings, with all their incidents already related,
suggested and engineered to their consummation in a sale
by one of these defendants, with another defendant as a
purchaser, no room is left for doubting the correctness
of the finding of the lower court; for where fraud is the
charge, any unusual method of transacting the business
always carries with it its own unfavorable presumptions;
human experience having demonstrated that, in attaining its ends, honest purpose never travels a crooked
road. *Baldwin v. Whitcomb*, 71 Mo. 651.

The judgment is affirmed. All concur in all of the
paragraphs in the foregoing opinion, except paragraph
IV. Ray, J., absent.