William Goldstein Company *v.* Joseph J. and Reynold H. Greenberg, Inc., et al., Appellants.

Argued April 9, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Robert T. McCracken,* with him *Yale L. Schekter,* for appellant.

*Abraham Wernick,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 21, 1945:

The plaintiff brought an action of assumpsit based on an alleged oral agreement to divide commissions and share profits on the purchase and resale of certain real estate in Philadelphia. The defendants were Joseph J. and Reynold H. Greenberg, Inc., a Pennsylvania corporation; Joseph J. Greenberg; Reynold H. Greenberg; Dora W. Greenberg and Alvin M. Greenberg. Plaintiffs' claim was for one-half of the profits of the transaction in which the plaintiff participated as an associate real estate broker with the defendant company, and which transaction it is claimed was subject to the agreement for a division of the profits. Plaintiffs' claim amounted to $47,500, plus interest. The jury returned a verdict for the plaintiff, in the amount of $3,125. There was a directed verdict for defendant, Dora W. Greenberg. Joseph J. and Reynold H. Greenberg, Inc., appealed from the action of the court below in refusing to enter judgment for the defendant n. o. v. The court below, in so refusing, said: "We cannot grant the motion for judgment n. o. v. However, even though it has not been asked for, we feel that in the interest of justice a new trial should be granted."

Goldstein, the President of plaintiff real estate company, submitted to the Pennsylvania Company an offer to purchase the premises at 1030 Race Street, Philadelphia, for a client. He claims he was induced by Greenberg, secretary and treasurer of the defendant real estate company, to substitute the latter's client as a purchaser and to share in the selling commission, in consideration of Greenberg taking Goldstein in some of his deals and sharing profits therefrom. Title from the

Pennsylvania Company was first taken in the name of Greenberg's elevator operator, and then transferred to Lester Bloch, who is married to Greenberg's sister. The consideration was $75,000. Five months later it was resold to Westinghouse Electric for $125,000 and also the premises at the N. W. Cor. 11th and Race Streets at a value of $20,000, making a total sale price of $145,000. The first affidavit of defense failed to disclose that Dora W. Greenberg, wife of Reynold H. Greenberg, had any interest in the property, but stated that Lester Bloch was the real purchaser.

Late in 1943 the Pennsylvania Company learned of these transactions and made a claim on Joseph J. and Reynold H. Greenberg, Inc., and on Reynold H. Greenberg, Joseph J. Greenberg, Dora W. Greenberg and Lester S. Bloch, individually, for a part of these profits. This claim was based upon the fiduciary relationship existing between itself and Greenberg, Inc., as broker in the transaction. The Pennsylvania Company accepted from Dora W. Greenberg the sum of $25,000, and from the Greenberg Company the sum of $3750 which that company had received from the Pennsylvania Company as commission, in full settlement of its claim.

After this agreement was executed, the defendants filed a supplemental affidavit of defense which disclosed for the first time that Dora W. Greenberg purchased the property jointly with Bloch.

It was shown at the trial of this case that Bloch invested no money in the property and received none of the profits. From the testimony of Dora W. Greenberg, the inference is plain that she was not the real purchaser of this property. When she was asked on cross-examination "The property was really your husband's, bought in your name for you?" she replied "I know nothing about it." Greenberg was asked on cross-examination whether he told Goldstein that Greenberg's wife was buying a half interest in the property, and he said: "I don't know whether I told him it was my wife or not. I didn't know

whether it was any of his business. In answer to another question, he said: "If I were the purchaser, I would have told him." He was then asked: "In other words, fair dealing would have required you tell him?" He answered: "That's right."

Greenberg on his cross-examination admitted that he authorized Goldstein to try to resell the property. He also admitted that "everytime he talks to another broker and he tells them that they may offer one of his properties for sale he doesn't have a specified arrangement with them; it is generally understood that if they bring me a purchaser for the property . . . there is a division of the commission." Goldstein's testimony as to his dealings with Greenberg over this property are as follows: He told Greenberg that he, Goldstein, was working on a deal at southeast corner 11th and Race with Simon Yellin." He said "that he had put in a bid of $75,000, $10,000 cash, and $65,000 mortgage." He said he was working on this deal with Simon Yellin. He said that Yellin had agreed to raise the bid to $15,000 cash. Greenberg said, "Have you spoken to Yellin about it yet?" I said no. He said, "Why don't you give that deal to us?" I said, "Well, in the first place, it is Yellin's proposition, and in the next place, with Yellin I get the full commission, I get the exclusive agency for the management of the property, then I'll be in on the resale, whereas if I take you in on the deal I have got to divide with you." Greenberg then said "You're foolish. Why don't you let us have it and we'll take you in on other deals besides this?" A short time afterwards Goldstein and Greenberg viewed the property, southeast corner of 11th and Race Streets, and Greenberg said "that if the building had a railroad siding, he could sell it to Westinghouse for $350,000. Later both parties met Yellin and after some discussion the latter said to Goldstein: "It's all right, Bill, let Reynold have the property."

Goldstein then told Greenberg that if the property was sold through Greenberg, that he, Goldstein, "wanted $500 cash and the balance of the commission to be split fifty-fifty." Greenberg said: "That's O. K.," and he also promised to take Goldstein on some other deals to make up what Goldstein was "giving them." They then went to see Sydney Davidson at the Pennsylvania Company, and Goldstein said to Davidson: "I am withdrawing Yellin's offer and substituting in its place an offer from Reynold Greenberg, who has a client who will buy that property." Sydney Davidson was called by the defendant and testified briefly in this case. He said that Mr. Goldstein did not have the exclusive agency to sell the property in question. On cross-examination he said: "An offer was submitted to us as a result of conversations with Mr. Goldstein."

Just what was the agreement between these parties, was a question for the jury; and since the jury found for the plaintiff, Goldstein's version of the agreement apparently was accepted.

Appellants base their claim for judgment n. o. v. upon a letter dated March 20, 1942, signed "Wm. Goldstein and Wm. Goldstein for William Goldstein Co." This letter was prepared by Reynold H. Greenberg. It states, inter alia: "I admit that in the event of such a resale [of premises Southeast corner 11th & Race Streets, Phila.] by Lester Bloch I would have no claim against either Lester Bloch or against you, but you kindly and of your own volition intimated to me at that time that if you received such a payment from Lester Bloch, you would remember me to some extent, and I realize that you assumed no legal obligation to me." The court below said of this letter: "Unless impeached, this is a complete accord and satisfaction. To avoid it, plaintiff testified that he was induced to sign it by defendant's fraud. The fraud averred is that Reynold Greenberg, defendant's agent, told plaintiff that defend-

ant's gross commissions in the deal would not exceed $3000, and its net compensation would not exceed $1500. Reynold denied this, but for the purpose of this motion we must accept it as fact. Such fraud would normally avoid any contract."

Appellants contend that "Goldstein's uncorroborated testimony is as a matter of law insufficient to reform or avoid the written agreement" of March 20, 1942. This would be true if the agreement itself which was prepared by Greenberg was not suspiciously verbose and "overdone" and if there were not facts and circumstances surrounding this contract which detract from the weight customarily accorded a written instrument.

53 Corpus Juris, page 1224, sec. 39, says: "The presence of unusual clauses in a release has a tendency to excite suspicion of fraud." It cites as an example the case of *Girard v. St. Louis Car-Wheel Co.*, 46 Mo. A. 79, 84, where the release contained this clause: "The [releasor] agrees to this deliberately and of his own free will, and without any undue influence from anyone." In that case appears the following: "It is said by Mr. Bump: 'Anything out of the usual course of business is a sign of fraud. Unusual clauses in an instrument excite suspicion.' . . . Bump on Fraudulent Conveyances, p. 51."

"Whenever fraud is the matter in issue, any unusual clause in an instrument, any unusual method of transacting the business, apparently done with the view for effect, and to give the transaction an air of honesty, is of itself a badge of fraud. For when the part is overacted the delusion is broken, and the fiction appears. . . . This has been the rule ever since Twyne's Case, 3 Coke 81, where it was held a circumstance of grave suspicion that a clause in the conveyance recited that the gift was made honestly, truly and bona fide." *Baldwin v. Whitcomb*, 71 Mo. 651.

Evidence sufficient to meet the standard of clearness, precision and indubitability required to vary a

written instrument does not have to be uncontradicted evidence, and corroboration of it may be found in surrounding circumstances: See *Broida v. Travelers Insurance Company*, 316 Pa. 444, 448, 175 A. 492. Among the circumstances which tend to corroborate Goldstein by casting doubt on the factual correctness of the letter he signed for Reynold H. Greenberg, after the latter prepared it, are these: First, the letter written by Greenberg (but signed by Goldstein) says: "I realize you assumed no legal obligation to me." The $750 payment is characterized in the letter as something by which Greenberg "remembered" Goldstein "to some extent," i.e., it was a mere gratuity. Yet the books of Greenberg, Inc., shows an entry of this same $750 as "commission on a sale," the entry being made from information received from Greenberg.

Second, the letter begins by saying: "I confirm our arrangement at your office this morning as follows:" The testimony of Greenberg (the letter's author) shows that *all* the "arrangement" was not discussed at the office that morning.

Third, the letter sets forth that there was "some discussion" between Greenberg and Goldstein as to the likelihood of Lester Bloch and his associates [1] reselling the property, and Greenberg had "stated to" Goldstein that "if it were resold at a good profit" he "believed they would make a generous payment to" Greenberg "out of the profit." Greenberg in his cross-examination says: "I did not tell him [Goldstein] I would get a generous portion of the profits."

Fourth, Goldstein denied, without refutation, that he had "agreed" in the "office" on the morning of March 20, 1942, that he had no "right to inquire" as to the stage of the negotiations for a resale.

Fifth, Greenberg took such pains to have Goldstein declare "I have agreed . . . I have no right to inquire

---

[1] This was misleading. There was only *one* "associate," Mrs. Reynold H. Greenberg.

. . . the stage which has been reached in the negotiations," that anyone reading the letter prepared by Greenberg is likely to conclude that the negotiations had *already reached* such an *attractive* "stage" [2] that if Goldstein had known what was "on the stage" he would have insisted that "the curtain go up" before he renounced his share of the profits. Furthermore, Goldstein and Greenberg bore to each other such a confidential relation as co-adventurers in a real estate transaction, that Greenberg breached his duty as a fiduciary in respect to Goldstein by inducing him to forego his right to inquire as to the stage it had reached, upon the payment to him of $750. Upon every fiduciary rests the duty of complete disclosure of all facts affecting his principal.

If when Goldstein signed this letter there were facts which Greenberg was under duty to disclose to him and he failed to do so, that non-disclosure amounted to fraud. Goldstein testified that when he was asked to accept this check he said to Greenberg: "Is this all you are making out of the transaction? If I've got your assurance that it is, I'll accept the check." Greenberg replied: "You don't think I'd cheat you?" This was not an unequivocal denial of cheating, but only an implied denial which Greenberg apparently hoped Goldstein would accept. Goldstein said to Greenberg: "I hope you won't [cheat me] but I can't understand why, out of a deal like this why you won't tell me all about it." Greenberg replied: "Well, if you ever find out I've cheated you, we're responsible you can always collect." Goldstein said: "All right, if you assure me I'm getting one-half of what you are making I'll take the check." He said he took the check relying upon that assurance.

----

[2] Ten days after the letter was signed Bloch and Mrs. Greenberg re-sold the property at a profit of $70,000. Property worth $20,000 passed as part consideration, to Bloch and Mrs. Greenberg four days after the letter was signed. In 1943 the Pennsylvania Company forced a disgorging of $28,750 of the profits. See paragraph 3 of this opinion.

In the transaction out of which this litigation arose, Goldstein and Greenberg were partners in a joint venture, and as such, they owed to each other fidelity. See *Bell v. Johnston,* 281 Pa. 57, 59, 126 A. 187. In *Jackson v. Clemson,* 103 Pa. Sup. Ct. 39, 45, 156 A. 540, the Superior Court said: "Joint adventurers in such a transaction must act with each other in the utmost good faith." In *Meinhard v. Salmon,* 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1, Chief Judge CARDOZO, of the New York Court of Appeals, said: "Joint adventurers, like co-partners, owe to one another, while the enterprise continues, the duty of the finest loyalty. . . . Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."

For one partner to conceal from another partner the truth as to the profits of a partnership transaction has the same vitiating effect on a contract between them and growing out of that transaction as the failure of one party to an ante-nuptial marriage contract to disclose to the other the facts as to the party's material possessions has on such a contract. In *Haberman's Estate,* 239 Pa. 10, 86 A. 641, we held that an ante-nuptial contract will not be sustained "where the evidence fails to show full disclosure to the woman of the value of the man's estate."

Vol. 2, Sec. 472, of the Restatement of Contracts makes the following statement: "(1) There is no privilege of non-disclosure, by a party who (b) knows that the other party is acting under a mistake as to undisclosed material facts, and the mistake if mutual would render voidable a transaction caused by relying thereon."

"Comment b . . . But if a fact known by one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows that the other does not know it, non-disclosure is not privileged and is fraudulent."

Appellant stresses the fact that the court below said: "Plaintiff's story, in the face of the letter signed by him,

seems incredible to all the members of the court." The court added this: "That, however, is not saying that the contract estops him from telling that story." This latter statement was a recognition of the fact that there was something intrinsical in the "contract" and something also in the surrounding circumstances which did *not* warrant the court's saying: "As a matter of law this written instrument is conclusive as to this entire controversy." *If* the letter was all true, plaintiffs' story *was* incredible. That "if" is the important qualification in passing on the legal effect of the written instrument defendant relied on in support of its motion for judgment n. o. v.

There is evidence from which a jury could reasonably infer that as an "accord and satisfaction" the contract invoked possesses more "color" than "fibre," and that when the light of surrounding circumstances is turned upon it, it is not what *it purports to be*. While this court has always exhibited great respect for written instruments, an instrument which in its very structure gives rise to doubts as to the legitimacy of its origin and as to the verity of its representations cannot be invoked to foreclose a jury's consideration of the issue to which it relates. When we declare, as we often do, that "we propose to stand for the integrity of written contracts," [3] we mean, of course, those written contracts which excite no just suspicion of their own intrinsic integrity. Fraud when it is prima facie established by proof of the required standard is *not* "merged in a written instrument;" nor is it so *sub*-merged that a jury cannot be given an opportunity to find it and declare it, no matter how artfully and persuasively the instrument itself proclaims its own purity.

The judgment is affirmed.

Mr. Justice Drew and Mr. Justice Horace Stern dissent.

---

[3] *Gianni v. Russell & Co., Inc.*, 281 Pa. 320, 325, 126 A. 791.