2017 PA Super 150

| | |
|---|---|
| CHRISTOPHER GUTTERIDGE AND APPLIED ENERGY PARTNERS, LLC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| J3 ENERGY GROUP, INC. T/D/B/A J3 ENERGY GROUP AND STEPHEN RUSSIAL | |
| Appellant | No. 3397 EDA 2013 |

Appeal from the Judgment Entered November 25, 2013
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2009-09160-CA

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES, PANELLA, SHOGAN, LAZARUS, OLSON AND OTT, JJ.

CONCURRING AND DISSENTING OPINION BY BOWES, J.:**FILED MAY 17, 2017**

While I agree with my distinguished colleagues that Christopher Gutteridge and Applied Energy Partners, LLC ("AEP") are entitled to judgment, we differ as to the amount of that judgment and against whom it should have been entered.  I believe the record fails to factually or legally support the imposition of personal liability against Stephen Russial.  At all relevant times, Mr. Russial was acting in his capacity as the President of his corporation, J3 Energy Inc.[1]  Furthermore, since the amount of the recovery was based at least in part on the equitable theory of unjust enrichment, the same equitable considerations militate in favor of deducting from the award

_____

[1] The trial court did not pierce the corporate veil to impose personal liability against Mr. Russial.

the commissions J3 already paid to Lori Porreca and Herb Keaton. Hence, I would vacate the judgment and remand the matter to the trial court to enter judgment against J3 Energy Inc. only, in an amount reflecting a deduction for the commissions J3 paid to Porreca and Keaton.

The trial court found that Mr. Russial and Mr. Gutteridge were engaged in a personal business relationship. It based its finding on Mr. Gutteridge's testimony that when he first met Mr. Russial, "I was dealing with him personally." N.T. 6/13/12, at 10. The personal nature of the relationship was further supported, according to the trial court, by Mr. Gutteridge's testimony that, in March of 2008, the issue arose "should we form a separate legal entity to run the Energy Buyer's Group." *Id*. at 11. Although counsel for J3 Energy advised that it was not necessary, Mr. Gutteridge testified that "the issue of how we should formalize the relationship came up a number of times over." *Id*. The trial court acknowledged that there were ongoing discussions regarding the formation of a joint venture between AEP and J3. It concluded, however, that, since there was no written agreement, it was "perfectly reasonable for Plaintiff Gutteridge to believe that the formation of the sales and marketing relationship between himself and Defendant Russial was ongoing and continued despite their inability to formalize the creation of the Energy Buyers Group." Trial Court Opinion, 6/11/14, at 4.

The majority characterizes the trial court's finding that Mr. Gutteridge and Mr. Russial were engaged in a personal business relationship as a credibility determination and declines to disturb it. I submit that there is no credibility dispute. The record establishes that Mr. Gutteridge and Mr. Russial were acting at all relevant times on behalf of AEP and J3 in pursuing the joint venture and Mr. Gutteridge's testimony is entirely consistent with that scenario. The record reveals the following.

Mr. Gutteridge knew Mr. Russial before they broached the subject of a joint venture between their companies. Mr. Gutteridge also was aware that J3 Energy was Mr. Russial's company, and he understood that the corporation "was a consulting firm, providing those sorts of services, bill audition, power factor correction, that type of thing." N.T., 6/12/12 at 34. It was "during a road trip to Pittsburgh in the fourth quarter of 2007" that they first discussed the joint venture. *Id*. at 32. Mr. Gutteridge was quick to point out that when they created the Energy Buyers Group, it was as a joint venture between Applied Energy Partners and J3 Energy. *Id*. at 10. AEP would supply sales and marketing services through its channel partners to obtain members; J3 Energy would contribute its energy expertise to manage a pool of energy and a demand response program. Their joint venture would be called Energy Management Group.

In a February 2008 email to Lori Porreca and other AEP channel partners, Mr. Gutteridge characterized the venture: "Steve Russial's

company, J3 Energy, and Applied Energy Partners will be jointly promoting and operating the 'Energy Buyers Group' throughout the mid-Atlantic states (PJM electrical region)." Exhibit P-2. Promotional materials and member agreements described Energy Buyers Group as a "joint venture composed of Applied Energy Partners and J3 Energy." The Energy Management Group membership agreements bore the logos of both Applied Energy and J3 Energy. According to Mr. Gutteridge, they included the logos of both entities "[b]ecause throughout the whole period we were introducing the Energy Buyers Group to every single customer as a joint venture between Applied Energy and J3." N.T., 6/12/12, at 77. He also explained that either he or Mr. Russial could sign the agreements on behalf of the joint venture in their capacities as principals for Applied Energy and J3.

The initial financial arrangement between Applied Energy and J3 Energy provided that commissions on sales would be paid to J3 Energy. That corporation would pay Applied Energy thirty-five percent of the gross revenue. *Id*. at 79. Applied Energy would pay commissions to its channel partners from its share of the commission.

Although Mr. Gutteridge and Mr. Russial spoke in terms of "I," "we," and "you" when they discussed the joint venture, it is apparent that they were dealing on behalf of their companies, AEP and J3. As Mr. Gutteridge explained, "At the point that we started setting up the Energy Buyers Group,

it was Applied Energy Partners J3 venture." ***Id***. at 10. This exchange during the cross-examination of Mr. Gutteridge illustrates that point.

> Q: At your deposition I remember asking you when you met Steve Russial were you aware of his company, J3 Energy Group, Inc., were you aware of that company?
>
> A: Yes.
>
> Q: And were you aware that the company was a corporation?
>
> A: No, not specifically, but I assumed so.
>
> . . . .
>
> Q: Mr. Gutteridge, I'm handing you your deposition on January 6, 2012 of this year. I'm bringing your attention to page 26, lines 14 through 21. Would you read those and let me know when you're finished?
>
> A: "Let's talk about that. One of my clients is J3 Energy Group Inc. Were you aware of J3 Energy Group, Inc. when you started dealing with Mr. Russial?"
>
> "Yes."
>
> "Were you aware that that was a corporation?"
>
> "Yes."
>
> . . . . .
>
> Q: I also asked you if, when you were dealing with Mr. Russial, were you dealing with him in his capacity as president of this corporation - of his corporation. You don't remember what you answer was?
>
> A: I don't remember what my answer was, but when I first met Mr. Russial, I was dealing with him personally. **At the point that we started setting up the Energy Buyers Group, it was Applied Energy Partners J3 venture.**

Q: I'm going to approach you one more time. If I show you, again, page 26, the last three lines, and then your answer on the top of your deposition testimony?

A: Yes. **You asked me in my dealings with Mr. Russial was he always dealing as president of J3 and I said I assumed so**.

Q: Thank you.

N.T., 6/13/12, at 8-10 (emphasis supplied).

I submit that personal communications between corporate principals regarding their businesses' participation in a joint venture do not constitute a business deal between individuals. At all relevant times, Mr. Russial was acting on behalf of his corporation, J3, and Mr. Gutteridge was acting as president of AEP, in discussing and forming the joint venture. This is entirely consistent with the fact that "a corporation must act through agents." *See Red Vision Sys. v. Nat'l Real Estate Info. Servs., L.P.*, 108 A.3d 54, 60 (Pa.Super. 2015); *see also Peters Creek United Presbyterian Church v. Wash. Presbytery*, 90 A.3d 95, 113 (Pa.Cmwlth. 2014) (a corporation acts through its officers, shareholders or members).

AEP and J3 Energy, acting through their principals, pursued the joint venture as they attempted to finalize the terms of their arrangement. The trial court concluded that when they failed to execute a formal written contract, it was "perfectly reasonable for . . . Gutteridge to believe that the formation of the sales and marketing relationship between himself and  . . .

Russial was ongoing and continued despite their inability to formalize the creation of the Energy Buyers Group." Trial Court Opinion, 6/11/14, at 4.

The trial court mistakenly concluded that because AEP and J3 did not execute a formal written agreement, the business relationship defaulted to one between Mr. Gutteridge and Mr. Russial personally. I submit there was a business relationship between AEP and J3, as evidenced by their common pursuit of members in Energy Management Group. Admittedly, the relationship stumbled, but technically, the absence of a formal written agreement was not legally required. A joint venture is a

> "special combination of two or more persons where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation": 30 Am. Jur., Joint Adventures, § 3. The existence or non-existence of a joint venture depends upon what the parties intended in associating together. It must arise from a contractual basis, although the contract need not be express but may be implied from the acts and conduct of the parties. To constitute a joint venture certain factors are essential: (1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a "joint proprietary interest and right of mutual control over the subject matter" of the enterprise; (4) usually, there is a single business transaction rather than a general and continuous transaction.

*McRoberts v. Phelps*, 138 A.2d 439, 443-444 (Pa. 1958). Whether a joint venture exists depends on the specific case, "and no fixed nor fast rule can be promulgated to apply generally to all situations." *Id*. The association can be one of corporations, which "by contract, express, or implied, agreed

to engage in a common enterprise for their mutual profit." ***Gold & Co. v. Northeast Theater Corp.***, 421 A.2d 1151, 1155 n.1 (Pa.Super. 1980).

The trial court concluded that AEP and J3 failed to reach a meeting of the minds on the specific terms of the joint venture and neither party challenges that finding on appeal. Nonetheless, the court imposed liability upon J3 Energy Inc. based on its breach of promises to AEP and unjust enrichment. I believe that characterizing the business relationship herein as a personal one between Mr. Gutteridge and Mr. Russial, and imposing personal liability on Mr. Russial, is legally irreconcilable with the court's concomitant finding of liability against J3 Energy Inc. based on its relationship with Applied Energy.[2] It does not follow that when those two entities failed to reach a formal joint venture agreement, the relationship devolved into a personal one between the principals.

The evidence, viewed in the light most favorable to Mr. Gutteridge and AEP, the prevailing parties below, establishes that Mr. Gutteridge and Mr. Russial were acting at all times on behalf of their respective companies in seeking to forge a joint venture. This was a failed business deal between J3

---

[2] I am aware that a corporate officer is subject to liability for breaching a promise extended not in his corporate capacity, but in his individual capacity. ***See Loeffler v. McShane***, 539 A.2d 876, 879 n.3 (Pa.Super. 1988). There is no evidence in the record that Mr. Russial's promises or representations about revenue sharing were made in anything other than his corporate capacity.

Energy and AEP, rather than Mr. Russial and Mr. Gutteridge. There is no factual or legal basis to impose personal liability against Mr. Russial, and thus, I would vacate the judgment and remand with directions to the trial court consistent with that finding.

The trial court invoked equitable remedies to ensure that the Defendants were not unjustly enriched and ordered them to make restitution in the amount of thirty-five percent of the revenue. The majority sanctions the trial court's refusal to credit against that amount the commission payments J3 made to Lori Porreca and Herb Keaton since the latter had not released Mr. Gutteridge and AEP from its obligation to pay such commissions. I believe equitable principles favor an offset for the payments J3 made to Porreca and Keaton even in the absence of a release. By not crediting the payments, the trial court has unjustly enriched Mr. Gutteridge and AEP as there is no viable legal means for Lori Porreca and Herb Keaton to recover again against those parties. *Judge Technical Servs., Inc. v. Clancy*, 813 A.2d 879, 887 (Pa.Super. 2002) ("An injured party cannot recover twice for the same injury, based on the theory that double recovery results in unjust enrichment.").

For all of the foregoing reasons, I would vacate the judgment and remand for proceedings consistent herewith.

Judge Shogan and Judge Olson join this Concurring and Dissenting Opinion.