J-S28008-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RUTHANN COLACHINO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JEFFREY JONES | : | |
| | : | |
| Appellant | : | No. 1845 MDA 2019 |

Appeal from the Order Entered October 8, 2019
In the Court of Common Pleas of Lackawanna County Civil Division at
No(s):  2018-01754

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:　　　　　　**FILED OCTOBER 09, 2020**

Jeffrey Jones appeals from the October 8, 2019 order finding that Ruthann Colachino was entitled to a one-half share of a winning lottery ticket with a pre-tax value of $100,000.  We affirm.

The instant dispute between Mr. Jones and Ms. Colachino concerns the proceeds of a "Bingo Squared" scratch-off lottery ticket with a face value of $100,000, which was purchased very early on the morning of February 22, 2018, at a Turkey Hill mini-mart located in Carbondale, Pennsylvania.  Mr. Jones and Ms. Colachino are former paramours, who have a minor child ("D.J.") together and have previously cohabitated.

In February 2018, the parties were in a period of attempted reconciliation.  On the evening in question, Mr. Jones had just received a sizable tax refund in the amount of $5,501 due to claiming D.J. as a dependent.  As part of an arrangement between the parties, he had agreed to

split this money with Ms. Colachino. The tax refund was credited to Mr. Jones's bank account shortly after midnight on February 22, 2018, and the parties immediately traveled together to the aforementioned mini-mart with cash in hand. Both Mr. Jones and Ms. Colachino were regular patrons of this establishment, where they were well-known for purchasing lottery tickets in one another's company. On this particular evening, Mr. Jones and Ms. Colachino purchased a number of lottery tickets in separate transactions, including at least four Bingo Squared scratch-off tickets.

Upon returning to their shared home, both parties began to "play" the tickets. Mr. Jones scratched one of the Bingo Squared tickets, and discovered that it was worth $100,000. The parties were understandably elated, and loudly professed their shared intention to use the money to leave public housing and buy a home together with the winnings. Later that day, the parties and D.J. traveled to Middletown, Pennsylvania, to cash-in the ticket. Ultimately, the Commonwealth issued a check in Mr. Jones's name for the post-tax amount of $72,930.

Alas, the parties' collective bliss did not last long. Mr. Jones ended his relationship with Ms. Colachino approximately one week later on March 3, 2018. The planned move and home purchase never occurred, and Mr. Jones did not share any portion of the lottery winnings with Ms. Colachino. On March 15, 2018, Ms. Colachino filed a complaint alleging that Ms. Jones had violated an "agreement" to split the lottery winnings equally with her, and asserting claims for breach of contract and conversion.

After discovery and the filing of an amended complaint, the case proceeded to a bench trial on July 29, 2019. The trial court heard succinct testimony from Mr. Jones, Ms. Colachino, Heather Coleman, the clerk who sold the winning ticket, and Ms Colachino's eldest daughter, J.C.. The court also reviewed surveillance footage from the Turkey Hill and related documents.

On October 8, 2019, the trial court found in favor of Ms. Colachino. Specifically, the trial court concluded that Mr. Jones and Ms. Colachino were involved in a "joint venture," and that Ms. Colachino was entitled to "her one-half share of the proceeds from the winning lottery ticket purchased on the morning of February 22, 2018 by the parties' lottery group." Trial Court Opinion, 10/8/19, at 3-4.

Mr. Jones filed a motion for post-trial relief alleging, *inter alia*, that the trial court erred by finding: (1) "that a joint venture existed between the parties when they did not combine resources for the purposes of purchasing lottery tickets, but rather made their own individual purchases;" and (2) "that the parties by their conduct agreed to split the proceeds from the winning ticket because such a finding is a resulting trust, and imposition of a resulting trust can only be made through a court in equity." Post-Trial Motions, 10/24/19, at ¶¶ 4-5. On November 15, 2019, the trial court denied Mr. Jones's post-trial motions.[1]

---

[1] We note that Mr. Jones did not timely file his post-trial motions. **See** Pa.R.C.P. 227.1(c)(1) (requiring post-trial motions to be filed within ten days

Appellant filed a timely appeal to this Court,[2] and pre-emptively filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).[3]  Prompted by Mr. Jones's gratuitous filing, the trial court authored a short Rule 1925(a) opinion relying upon the reasoning previously set forth in its October 8, 2019 memorandum and order.

Mr. Jones has raised two claims for our consideration in this case:

1.  Did the trial court abuse its discretion or commit an error of law in its October 8, 2019 [o]rder by applying the preponderance of evidence standard of proof to the evidence when it essentially found a resulting trust, which requires an examination by the clear and convincing standard of proof?

_____

of a "verdict" in a case).  However, if the trial court accepts untimely filed post-trial motions and rules on the merits thereof, this Court will treat the issues as having been properly preserved for appellate review. ***See Behar v. Frazier***, 724 A.2d 943, 945-46 (Pa.Super. 1999).  Consequently, we will deem those issues raised in Mr. Jones's post-trial motions to have been properly preserved for our appellate review. ***Id***.

[2]  Mr. Jones timely filed his notice of appeal on November 6, 2019, while his post-trial motions were still pending before the trial court.  On November 15, 2019, the trial court denied Mr. Jones's post-trial on the merits.  On January 28, 2020, this Court entered a rule to show cause as to why Mr. Jones's appeal should not be dismissed as premature.  Mr. Jones argued that Pa.R.A.P. 905(a)(5) permitted this procedure, as it provides that "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof."  Ultimately, we granted Mr. Jones leave to file a *praecipe* to enter a final judgment with the trial court to perfect jurisdiction.  Appellant complied, and a final judgment was entered by the trial court on February 24, 2020.  Thus, Appellant's appeal was timely filed pursuant to Pa.R.A.P. 905(a)(5).

[3]  "Because the trial court did not order the filing of a Rule 1925(b) statement, we will not conduct a waiver inquiry pursuant to Pa.R.A.P. 1925(b)(4)." ***Commonwealth v. Antidormi***, 84 A.3d 736, 745 n.7 (Pa.Super. 2014).

- 4 -

2. Did the trial court abuse its discretion or commit an error of law in its October 8, 2019 [o]rder by finding that a joint venture existed between the parties when they did not combine resources for the purposes of purchasing lottery tickets but instead made individual purchase[s]?

Mr. Jones's brief at 6.

With respect to Mr. Jones's first claim for relief, we discern that he is attempting to recast the civil relief granted to Ms. Colachino as effectively creating a "resulting trust."[4] **Id**. at 13 ("The relief requested and the court's determination amounted to the existence of a resulting trust on behalf of Ms. Colachino."). As such, Mr. Jones argues the trial court utilized the wrong standard of proof in assessing Ms. Colachino's claims. **Compare Fenderson v. Fenderson**, 685 A.2d 600, 605 (Pa.Super. 1996) ("The law requires clear, direct, precise and convincing evidence of a resulting trust before it will convert absolute ownership into an estate of lesser quality.") **with Snyder v. Gravell**, 666 A.2d 341, 343 (Pa.Super. 1995) ("[T]he party having the burden of proof in a contract matter must sustain it by a preponderance of the evidence." (internal citations and quotations omitted)).

Initially, we note that neither Ms. Colachino's amended complaint, nor the trial court's memorandum and order, contemplated the creation of a

---

[4] "A resulting trust arises when a person makes a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have a beneficial interest in the property." **Fenderson v. Fenderson**, 685 A.2d 600, 604 (Pa.Super. 1996).

resulting trust.[5]   However, before engaging with the arguable merits of Mr. Jones's first claim, we must first assess whether Mr. Jones preserved this specific argument in his post-trial motion.   *See* Pa.R.C.P. 227.1(b)(1)-(2); *Puleo v. Thomas*, 624 A.2d 1075, 1077 (Pa.Super. 1993) ("[A] failure to raise an issue in post[-]trial motions or exceptions would normally result in a waiver of that issue for purposes of appellate review.").   "The purpose of this rule is to provide the trial court the first opportunity to review and reconsider its earlier rulings and correct its own error."   *Chalkey v. Roush*, 757 A.2d 972, 975 (Pa.Super. 2000) (internal citation and quotation marks omitted).

Mr. Jones's post-trial motion includes only one argument concerning the alleged creation of a resulting trust in this case.   Specifically, Mr. Jones asserted that the "imposition of a resulting trust can only be made through a court in equity."   Post-Trial Motions, 10/24/19, at ¶ 5.   However, there is no exception or argument concerning the standard of proof utilized by the trial court.   Consequently, the trial court did not have an opportunity to review and consider this specific line of argument in the first instance.   Therefore, Mr. Jones has waived his first claim for failure to preserve it in his post-trial motions. *See Board of Supervisors of Willstown Township v. Main Line*

---

[5]  Mr. Jones repeatedly cites this Court's holding in *Snyder v. Gravell*, 666 A.2d 341, 343 (Pa.Super. 1995), to support his contention that Ms. Colachino was seeking the imposition of a resulting trust.   However, Mr. Jones has fundamentally misunderstood the procedural posture of our holding in *Snyder*.   Specifically, the plaintiffs in that case specifically requested the imposition of a resulting trust.   *Id*. ("In this case, however, appellants sought the imposition of a resulting trust as a remedy for appellees' alleged breach of contract.").   Ms. Colachino has not.   Thus, *Snyder* is inapposite.

***Gardens, Inc.***, 155 A.3d 39, 44 (Pa. 2017) ("Rule 227.1 requires parties to file post-trial motions in order to preserve issues for appeal, and if an issue has not been raised in a post-trial motion, it is waived for appeal purposes." (internal citation and quotation marks omitted)).

Appellant's second claim is more straightforward and essentially challenges the sufficiency of the evidence adduced by Ms. Colachino to support her civil claims. ***See*** Appellant's brief at 22 ("[A] review of the record . . . demonstrates that Ms. Colachino did not establish any evidence in the record to support the existence of a joint venture lottery group with Mr. Jones[.]"). Thus, Mr. Jones asserts that the trial court erred in finding that a joint venture existed between Mr. Jones and Ms. Colachino. ***Id***. at 20-33.

> Our standard of review in non-jury cases is limited to
>
> > a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

***Gutteridge v. J3 Energy Group, Inc.***, 165 A.3d 908, 914 (Pa.Super. 2017) (internal citation and quotation marks omitted). Additionally, "[i]n a non-jury trial, the factfinder is free to believe all, part, or none of the evidence, and the Superior Court will not disturb the trial court's credibility determinations." ***Id***. at 916 (citing ***Triffin v. Dillabough***, 716 A.2d 605, 607 (Pa. 1998)).

Under Pennsylvania law, a joint venture is a "special combination of two or more people where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation." *McRoberts v. Phelps*, 138 A.2d 439, 443 (Pa. 1958); *see also Gold & Co., Inc. v. Northeast Theater Corp.*, 421 A.2d 1151, 1153 n.1 (Pa.Super. 1980) ("A joint venture is an association of persons or corporations, who by contract, express or implied, agreed to engage in a common enterprise for their mutual profit."). "The existence or non-existence of a joint venture depends on the facts and the circumstances of each particular case and no fixed or fast rule can be promulgated to apply generally to all situations." *McRoberts*, *supra* at 444. Overall, the existence of a joint venture "depends upon what the parties intended in associating together," but "[i]t must arise from a contractual basis, although the contract need not be express but may be implied from the acts and conduct of the parties." *Id*. at 443-44.

Despite the open-ended nature of this inquiry, our Supreme Court has identified certain "essential" factors, including: (1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) joint proprietary interest and right of mutual control over the subject matter of the enterprise; and (4) a single business transaction rather than a general and continuous transaction. *Id*. at 444.

The trial court authored the following summary of the evidence it found relevant to its assessment of Ms. Colachino's civil claims:

During trial, [Ms. Colachino] offered as evidence the testimony of the clerk who was working at the Turkey Hill [mini-mart] when the lottery ticket purchase was made. According to that clerk, the parties purchased lottery tickets together on many past occasions. Also, the clerk indicated that the parties made several transactions of interest, . . . where they bought a total of four "Bingo Squared" lottery tickets. A video tape of the action in the store that morning was introduced as evidence, and it reflects [Ms. Colachino] standing at the . . . store counter where she is subsequently joined by [Mr. Jones], and they both purchased lottery tickets, including the "Bingo Squared" tickets. The video verifies that they entered the store together and before leaving the store together, they bought lottery tickets in more than one transaction. Further testimony showed that after they left [the] Turkey Hill, [the parties] went back to "her" or "their" residence, . . ., played the scratch-off tickets, and it was a ticket that [Mr. Jones] was playing that revealed itself to be a $100,000.00 winner. According to the recollection of Plaintiff's daughter about the circumstances attendant to the win, both parties were exclaiming "We won" and "We are buying a house." As evidenced by the parties' seven years of buying lottery tickets together and the testimony which supported that fact, we agree that [the parties] were, by mutual agreement, in a lottery group with the operating rule being the equal sharing of any monies won. Whether or not the video showed the two actually pooling or exchanging money at the store's lottery counter is immaterial to the circumstances that the pair, as a lottery group, had been together buying lottery tickets at [the Turkey Hill] for years, and were reconciled as a couple when the winning ticket was bought on February 22, 2018.

Trial Court Opinion, 10/8/19, at 3.

Viewing the testimony and evidence of record in the light most favorable to Ms. Colachino as the verdict winner, we conclude that the trial court's factual assessment is supported by the certified record.

The underlying events in this case were captured on video, and are not reasonably in dispute. Moreover, the testimony from Mr. Jones, Ms. Colachino, and Ms. Coleman all independently confirm that the parties

regularly purchased lottery tickets while in one another's company. Mr. Jones conceded that the parties were in the habit of playing the lottery at least two years prior to these events. *See* N.T. Trial, 7/29/19, at 23 (claiming that the parties were playing the lottery but not splitting winnings). Both Ms. Colachino and Ms. Coleman similarly testified that the parties regularly played the lottery. *Id*. at 28-29, 49-50; *see also* Appellant's Amended Complaint, 5/2/18, at Exhibit A (attesting that the parties regularly purchased lottery tickets from Ms. Coleman at the Turkey Hill mini-mart).[6]

Mr. Jones emphasizes that the parties made separate purchases. However, Mr. Jones' arguments ignore that the purchaser of the winning ticket was not definitively identified at trial. *See* N.T. Trial, 7/29/19, at 55. Moreover, Mr. Jones himself testified that he could not accurately differentiate between the respective tickets purchased by the parties. *Id*. at 10, 17. Thus, the mere fact that the parties engaged in separate purchases of lottery does not avail Mr. Jones because the certified record does not confirm that he actually purchased the winning ticket.[7]  Contrary to Mr. Jones's arguments,

_____

[6] This signed document was introduced during the bench trial as "Exhibit H," and utilized by both Ms. Colachino and Mr. Jones during Ms. Coleman's testimony. *See* N.T. Trial, 7/29/19, at 54-55, 59.

[7] Moreover, we note that the tax refund which funded the parties' endeavors on the morning of February 22, 2018, were the result of an arrangement between the parties that Mr. Jones would share the money equally with Ms. Colachino. *See* N.T. Trial, 7/29/19, at 8, 25-28. Thus, both parties can reasonably be construed as "contributing" to the joint venture that permitted the purchasing of the subject lottery tickets with their respective funds.

his testimony evinces a clear intent to use the winnings for the mutual benefit of the parties. *Id*. at 13 ("I said I was buying a house. And she – her and my son were going to come with me.").

Although the trial court's discussion does not apply the four factors noted in *McRoberts*, *supra*, we believe that those factors are satisfied here. Again, viewing the evidence in the light most favorable to Ms. Colachino, the evidence of record indicates that: (1) both Ms. Colachino and Mr. Jones made contributions to the joint lottery venture, *e.g.*, purchases of lottery tickets; (2) testimony from both parties indicated an initial intent to use the winnings for their mutual benefit; (3) the parties enjoyed a "right of mutual control" over the lottery tickets, as evinced by their inability to differentiate amongst the tickets purchased; and (4) these joint entrepreneurial efforts were limited to lottery tickets. *Accord McRoberts*, *supra* at 443-44. Furthermore, there is "no fixed or fast rule" with respect to the existence of a joint venture. *Id*.

Indeed, Mr. Jones's claim is essentially that the trial court should have credited his version of events over that of Ms. Colachino. However, the trial court explicitly rejected Mr. Jones's version of events as incredulous. *See* Trial Court Opinion, 10/8/19, at 3 ("In [my] view, it is extremely unlikely that the parties "just happened to be together" at the [Turkey Hill], as [Mr. Jones] claims. Their long-standing pattern of buying tickets together belies his claim."). We cannot disturb the credibility determinations rendered by the trial court.

Overall, we discern no abuse of discretion or legal error in the trial court's analysis. As such, no relief is due on this issue.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/9/2020